# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00018-JMC** |
| **v.** | : | |
| | : | |
| **JAMES WAYNE BROOKS,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant James Wayne Brooks  3 months' incarceration, which is the mid-point of the 0 to 6 month sentencing guideline range; 12 months of supervised release; $500 restitution; and the mandatory $100 special assessment.

### I.      Introduction

Defendant James Wayne Brooks, a 51-year-old Army veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] Although the Statement of Offense in this matter, filed on 08/04/2022, (ECF No. 27 at ¶ 6) reflects a sum of more than $1.4 million dollars for repairs, as of October 17,  2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

Defendant Brooks pleaded guilty to one count of violating 18 U.S.C. §1752(a)(1). As explained herein, a sentence of to  3 months' incarceration, 12 months' supervised release,  and $500 in restitution is appropriate in this case because Brooks (1) prepared for violence by bringing tear gas, a camouflage body armor vest and two-way radio  to Washington, D.C.;  (2) climbed railings in order to access the Capitol; (3) gave a television interview that disclaimed responsibility; (4) observed people punching officers and still remained at the Capitol; (5) had verbal altercations with police officers on the Capitol grounds where he waived a military ballcap at officers and shouted, "You took an oath like I did, so did you, every one of you! What are you doing! Help us make this a better fucking place! All you gotta do, is do the right thing! That's all I'm asking! Do the right thing!" and (6) remained at the Capitol for at least 2 and one-half hours.

The Court must also consider that Brooks' conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. *See United States v. Thomas Fee*, 1:21-cr-00133 (JDB), Tr. 04/01/2022 at 17 ("The defendant was an active participant in a mob assault on our core democratic values and our cherished institution. And that assault was intended by many and by the mob at large in general to interfere with an important democratic processes of this country. I cannot ignore that, cannot pull this misdemeanor out of that context.") (statement of Judge Bates). The defendant's actions and those of his fellow rioters enabled the breach of the Capitol, threatened the lives of the police officers, legislators and their staffs, and disrupted the certification vote for several hours. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, the facts of and circumstances

of Brooks' crime support a sentence of to 3 months' incarceration, 12 months of supervised release, and $500 in restitution in this case.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Brooks' conduct and behavior on January 6.

### Defendant Brooks' Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, James Brooks traveled to Washington, D.C., from his home in Johnson City, Tennessee, to attend the "Stop the Steal" rally. After attending the former President's rally, Brooks walked to the Capitol.  Brooks was prepared for violence: he wore body armor and carried pepper spray.

Brooks arrived at the West Front of the Capitol at approximately 2:29 p.m.  The scene there was one of chaos.  Hundreds of police officers at the front of the inauguration stage, who had actively defended their position for over an hour, were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.  By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  With their defensive lines extinguished, several police officers were surrounded by the crowd.  The rioters had seized control of the West

Plaza and the inauguration stage.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.

Brooks now joined this mob, making his way toward the Upper West Terrace.  There, Brooks climbed onto a concrete railing, and stood, waving a South Carolina state flag with a United States Marine Corps logo attached, as shown in Figure 1, below.  Brooks is wearing a baseball style cap with yellow/gold embroidering, camouflage vest with a radio attached, black hoodie with gray sleeves and a red lined hood, blue sunglasses, a multicolored mask and black pants:



*Figure 1*

Brooks then made his way to the Upper West Terrace Door and entered the Capitol at approximately 2:37 p.m.  While inside the Capitol, Brooks kept his face covered and wore sunglasses, as shown in Figure 2 below.  Additionally, he had a communication radio attached to his vest, as can be seen in a later surveillance images (Figures 3 and 4).



*Figure 2*

Brooks walked up the stairs to Statutory Hall, and  then walked towards the Rotunda.  However, Brooks did not enter the Rotunda but instead  walked down the stairs to the first floor.  Once downstairs, at approximately 2:42 p.m., Brooks passed the House Wing Door and continued to walk through the Capitol.  At approximately 2:46 p.m., he passed through the metal detector located at the South Door Vestibule.



*Figure 3*

At approximately 2:47 p.m. Brooks exited the Capitol through the South Door Vestibule.

In total, Brooks spent approximately 10 minutes inside the Capitol.



*Figure 4*

Although Brooks left the Capitol Building, he remained on restricted Capitol grounds.

Upon exiting the South Door Vestibule door, Brooks made his way towards the East Front Doors.  Brooks climbed the steps of the East Front Doors landing at approximately 2:51 p.m.  He remained on the landing near the East Front Doors for approximately 36 minutes, interacting with other rioters as rioters continued to gain access the Capitol.  At approximately 3:27 p.m. Brooks walked down the steps.

 Approximately an hour later, Brooks went to the Senate side of the Capitol, where he encountered police who were attempting to disperse the rioters near the North Screening Egress Standing at the front of the police line and waving his military veteran's ballcap, Brooks – no longer wearing his mask – yelled at the officers, "You took an oath like I did, so did you, every one of you! What are you doing?! Help us make this a better fucking place! All you gotta do, is do the right thing! That's all I'm asking! Do the right thing!" Exhibit 1.

Brooks eventually left the Capitol grounds at approximately 5:05 p.m.  In total, Brooks was on the Capitol grounds for approximately 2 hours and 32 minutes, from approximately 2:33 p.m. to 5:05 p.m.  Brooks acknowledged that he saw acts of violence at the Capitol where people threw punches at law enforcement and pushed officers.  Brooks also observed law enforcement deploying pepper spray balls towards rioters and smelled the pepper spray.

*Brooks' Post-arrest Interview with the FBI*

On January 5, 2022, Brooks gave a voluntary post-arrest interview to the FBI. During the interview, he admitted traveling to Washington for the rally.  Brooks said he decided to go to Washington because he had been to two prior Trump rallies and had not seen any violence.

Brooks stated that it was it is important that the FBI understand that he believed things were going to go differently that day. Brooks stated he believed the election was stolen. He

believed all of the law enforcement and military would do what he thought was the right thing and arrest anyone involved in the election fraud. Brooks thought Nancy Pelosi was one that was going to be arrested for sure. Brooks was hoping to see and be a part of something historic and to "take our country back." Brooks stated his intent was not to be violent with law enforcement officers, Brooks stated he believed they were going to "turn" but it did not go down that way.

Brooks stated that while he was in the Capitol several officers directed him on different paths.  Brooks advised that at the time he didn't realize it; however, he believes the officers were funneling him out of the building when they directed him on his path.  While inside the Capitol Brooks stated he heard people chanting, "stop the steal" as well as "whose house our house." Brooks admitted he was carrying pepper spray while in the Capitol as well as wearing a body armor vest.  Brooks advised he had these items for protection.

Brooks advised he was not concerned with being contacted by the FBI because he felt he did not do anything wrong.

Brooks told the FBI he had no intentions of hurting anybody. Brooks stated he believed the military and police would say, "this is bullshit, this is a fraud." When it didn't happen that way, Brooks stated he "wanted to get the fuck out of there." Brooks thought to himself that he has kids and a family.

Brooks stated he  did not want to be at the Capitol as night approached because, "some bad shit can happen under the cover of night." Brooks stated he was wearing the body armor in case he got shot. He stated it was a Kevlar/ballistic vest.  Brooks stated he wore the body armor in case he got shot.  When asked who he was afraid would shoot him, Brooks stated ANTIFA or mistaken identity.  Brooks stated if an officer found himself with his back to the wall and he is getting beaten

or threatened and there was a crowd of 20 people in front of him, and I'm that officer and I've got a weapon, "sorry about your luck but you are getting off of me."

*Defendant Brooks' Interview with WJHL News Channel 11*

On January 13, 2022, approximately one week after being arrested and charged, James Wayne Brooks was interviewed Johnson City, Tennessee CBS local affiliate station WJHL. Brooks admitted to being in the Capitol on January 5, 2021 and stated he was non-violent and allowed into the building by Capitol Police.

Brooks stated he was carrying pepper spray that day for his own protection. Brooks claimed he was misled by QAnon theories that the FBI and soldiers would be standing behind Trump because it was a fraudulent election. Brooks stated, "President Trump asked that we march to the Capitol, so we did." Lastly, Brooks stated if he knew then what he knows now that all of the QAnon and underground news that he was reading was false, he would have still gonebut would not have entered the Capitol building.

*The Charges and Plea Agreement*

On January 3, 2022, the United States charged Brooks by criminal complaint with violating 18 U.S.C. § 1752(a)(1)- Entering and Remaining in a Restricted Building or Grounds 18 U.S.C. § 1752(a)(2)- Disorderly and Disruptive Conduct in a Restricted Building or Grounds 40 U.S.C. § 5104(e)(2)(D)- Disorderly Conduct in a Capitol Building 40 U.S.C. § 5104(e)(2)(G)- Parading, Demonstrating, or Picketing in a Capitol BuildingOn January 13, 2022, the United States charged Brooks by a 4-count Information with violating 18 U.S.C. § 1752(a)(1)- Entering and Remaining in a Restricted Building or Grounds 18 U.S.C. § 1752(a)(2)- Disorderly and Disruptive Conduct in a Restricted Building or Grounds 40 U.S.C. § 5104(e)(2)(D)- Disorderly Conduct in a Capitol Building 40 U.S.C. § 5104(e)(2)(G)- Parading, Demonstrating, or Picketing in a Capitol Building.

On March 3, 0222 a superseding criminal complaint charged Brooks with 18 U.S.C. § 1752(a)(1)-
Entering and Remaining in a Restricted Building or Grounds 18 U.S.C. § 1752(a)(2)- Disorderly
and Disruptive Conduct in a Restricted Building or Grounds 40 U.S.C. § 5104(e)(2)(D)-
Disorderly Conduct in a Capitol Building 40 U.S.C. § 5104(e)(2)(G)- Parading, Demonstrating, or
Picketing in a Capitol Building.  On August 4, 2022, pursuant to a plea agreement, Brooks pleaded
guilty to Count One of the Superseding Information, charging him with a violation of 18 U.S.C. §
1752(a)(1)- Entering and Remaining in a Restricted Building or Grounds.  By plea agreement,
Defendant agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Brooks now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(1). As
noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of
imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the
terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545
F.3d 1072, 1078-79 (D.C. Cir. 2008).

### The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings
by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49
(2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should
be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49.
The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful
study based on extensive empirical evidence derived from the review of thousands of individual
sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at
49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Cordon's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | +4 |

*See* PSR at ¶¶ 29 - 37.

The U.S. Probation Office calculated Brooks criminal history as a category I. PSR at ¶ 41. Accordingly, the U.S. Probation Office calculated Brooks' total adjusted offense level, after acceptance, at 4, and his corresponding Guidelines imprisonment range at 0 – 6 months. PSR at ¶81. Brooks' plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of  90 days' incarceration, none year supervised release,  and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 was a crime unparalleled in American history and defies comparison to other violent riots. It represented a grave threat to our democratic norms and practices. Indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants.

While each defendant must be sentenced based on their own conduct, this Court should take into account that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they very likely crossed through numerous barriers and barricades and heard the violent outcries of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting between the rioters and police and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Brooks' individual conduct and fashioning a just sentence, this Court should look to a number of critical aggravating and mitigating factors, including: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) defendant's reaction to acts of violence or destruction; (5) whether, during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether

the defendant cooperated with, or ignored commands from police officers; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had Brooks personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of Brooks is therefore not a mitigating factor in misdemeanor cases.

Brooks was prepared for violence when he traveled to Washington, D.C. He brought pepper spray, wore body amor and carried a two-way radio.   The defendant was also prepared with a medical kit in the event there was injury to him or others.  In order to access the Capitol, the defendant climbed railings.

As an Army veteran, Brooks was well-aware of the great jeopardy posed by violent entry into the Capitol by the rioters. Brooks observed violence at the Capitol to include people punching as well as officers using pepper spray pellets.

Additionally, the defendant had verbal altercations with police officers on the Capitol grounds where he waived a military ballcap at officers and shouted, "You took an oath like I did, so did you, every one of you! What are you doing! Help us make this a better fucking place! All you gotta do, is do the right thing! That's all I'm asking! Do the right thing!" Brooks' actions detracted the officers from securing the Capitol and he was one of many rioters that had to be assessed for dangerous and fueled the on-going riot.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of  90 days' incarceration, 12 months' supervised release, and $500 in restitution in this matter.

### B.  The History and Characteristics of Brooks

As set forth in the PSR, Brooks' criminal history consists of a 2013 misdemeanor conviction for reckless driving and possession of drug paraphernalia. ECF 22 ¶ 40. The defendant enlisted in the Army in 1990 and served until 2005 where he was honorable discharged.  The defendant has also served in the Tennessee National Guard from 1995 to 2012.

As a former military member, Brooks was well aware that he did not have the right to enter restricted government buildings. His voluntary decision to storm a guarded government building is troubling in light of his former military service and training.

### The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### C.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [[Defendant Last Name]] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

15

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The defendant gave a statement to law enforcement and expressed remorse for his actions on January 6, 2021 and indicated that had things been different he would not have gone to Washington on January 6, 2021.  However, approximately a week after January 6, 2021, the defendant went on a television station and stated that had things been different he would have still gone to Washington on January 6, 2021, but he would not have gone inside the Capitol.  There is a need to specifically deter the defendant from repeating his actions from January 6, 2021..  The defendant was aggressive and verbally abusive to officer outside the Capitol while he was in Washington.

### D.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Brooks based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

Although those like Brooks convicted of misdemeanors are generally less culpable than defendants convicted of felonies, misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes. A probationary sentence should not be the default.[4] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth at sentencing). Accord, *United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman).

Brooks has pleaded guilty to Count One of the Superseding Information, charging him with 18 U.S.C. § 1752(a)(2). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365

---

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

(D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Glen Mitchell Simon*, 21-cr-003446 (BAH), the defendant plead guilty to 18 U.S.C. 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds) while being charged with the same charges as Brooks. Again, like Brooks, Simon came wearing a body armor type vest. Judge Howell sentenced Simon to 8 months incarceration.

18

Another similar case is *United States v. Kene Lazo*, 21-cr-00425 (CRC).  Lazo was charged with the same four charges as Brooks and plead guilty to 40 U.S.C. 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol building).  Although Lazo wore additional defense gear, namely a helmet and a shield, Lazo also wore body armor like Brooks.  Judge Cooper sentenced Lazo to 45 days incarceration.

In *United States v. Anthony Mazzio*, 22-cr-00214 (RCL), Mazzio was charged with the same four charges as Brooks and plead guilty to 40 U.S.C. 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol building).  Like Brooks, Mazzio entered the Capitol wearing body armor and was sentenced to 60 days incarceration.  Judge Lamberth sentenced Mazzio to a term of 60 days and 36 months probation.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**V.      Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 90 days' incarceration, 12  months' supervised release, and $500 in restitution Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      s/ *Zachary Phillips*
Assistant United States Attorney
CO Bar No. 31251
Capitol Riot Detail
United States Attorney's Office, Detailee
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: (729) 281-1611
Zachary.phillips@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 21st day of October, 2022 a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

s/ <u>*Zachary Phillips*</u>
Assistant United States Attorney
CO Bar No. 31251
Capitol Riot Detail
United States Attorney's Office, Detailee
1801 California Street, Suite 1600
Denver, CO 80202
Telephone: (729) 281-1611
Zachary.phillips@usdoj.gov
